IN THE UNITED STATES DISTRICT COURT FOR THE
MIDDLE DISTRICT OF GEORGIA
MACON DIVISION

SANDRA H. HUBBARD,                     :
                                       :
    Plaintiff,                         :
                                       :
    v.                                 :
                                       :      No. 5:11-CV-290 (CAR)
GEORGIA FARM BUREAU                    :
MUTUAL INSURANCE COMPANY,              :
                                       :
    Defendant.                         :
_____       :

## ORDER ON DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

Before the Court is Defendant Georgia Farm Bureau Mutual Insurance Company's Motion for Summary Judgment [Doc. 18].  Plaintiff Sandra H. Hubbard contends Defendant terminated her in retaliation for reporting sex discrimination and sexual harassment, in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e, *et seq.* ("Title VII").  After fully considering the matter, the Court finds that triable issues of fact exist as to both of Plaintiff's retaliation claims.  Thus, Defendant's Motion for Summary Judgment [Doc. 18] is **DENIED**.

1

## BACKGROUND

Plaintiff worked as an insurance agent for Defendant Georgia Farm Bureau Mutual Insurance Company in its Webster County, Georgia office from 1994, until she was terminated on December 4, 2008.   Plaintiff contends Defendant unlawfully terminated her in retaliation for reporting sex discrimination and sexual harassment. Defendant, on the other hand, maintains it lawfully terminated Plaintiff for her failure to apologize for unprofessional conduct toward one of Defendant's influential policy-holders and his wife.   The facts of this case, viewed in the light most favorable to Plaintiff, are as follows.

Defendant's Relationship with County Farm Bureaus

Because an understanding of the relationship and interplay between Defendant, the county Farm Bureaus, and the farmers who make up the county Farm Bureaus is both helpful and necessary to understand this case, the Court will start with a background of the Georgia Farm Bureau organization and its establishment of Defendant.

Georgia Farm Bureau is a grassroots organization that uses its resources and facilities "to assist in providing farm families a fair and equitable standard of living and

to ensure the existence of agriculture as a vital and thriving industry in the future."[1]

"To understand Farm Bureau, it is important to start at the local rather than the state level. It is in the 159 county Farm Bureaus where programs are developed to meet the needs of farm families. Farm Bureau relies on its member families for strength and direction."[2] Every county in the State of Georgia has a county Farm Bureau; individual farmer members form the county Farm Bureaus; and the county Farm Bureaus, in turn, form Georgia Farm Bureau.

To provide insurance to its members, Georgia Farm Bureau established Defendant – Georgia Farm Bureau Mutual Insurance Company. Defendant employs local insurance agents in counties throughout Georgia to service its policy-holders, the majority of whom are the farmers who make up the county Farm Bureaus.[3] Defendant and its insurance agents work closely with the county Farm Bureaus. Defendant maintains business agreements with each county Farm Bureau, providing certain funds to the county Farm Bureau in exchange for the county Farm Bureau's assistance in the solicitation and service of Defendant's insurance policy-holders.[4] As part of the agreement, the county Farm Bureau owns and provides the office space used by

---

[1] About Georgia Farm Bureau, http://www.gfb.org/aboutus/default.html.
[2] *Id.*
[3] Defendant no longer requires its policy-holders to be farmers.
[4] Pl. Depo, pp. 41-42; 118 [Doc. 18-9].

3

Defendant's insurance agents and pays the salary for the support staff who assist Defendant's agents.[5]

Each county Farm Bureau is operated by a county Farm Bureau board comprised of farmer members who hold insurance policies written by Defendant. Due to their voting privileges and control of the office space and support staff, county Farm Bureau board members and the farmer members themselves have considerable influence over the county agents and within Defendant.

Plaintiff's Employment in Webster County

Plaintiff worked as an insurance agent in Defendant's Webster County agency.[6] The building for Defendant's Webster County office is owned by the Webster County Farm Bureau Board (the "Board"), and the Board hires and pays the salary for the secretary staffing the office.[7] The Board is comprised of farmer policy-holders in Webster County. The Board aids in soliciting new policy-holders and is instrumental in promoting, maintaining, and growing Defendant's business in Webster County.[8] As part of her employment, Plaintiff was required to maintain a positive relationship with

---

[5] *Id.* at pp. 19-20; 41.
[6] *Id.* at p. 18.
[7] Minnick Depo., p. 19-20 [Doc. 18-8].
[8] Pl. Depo., p. 39-40 [Doc. 18-9].

the Board, attend Board meetings, and keep the Board informed of issues concerning Defendant's business in Webster County. [9]

Plaintiff began working for Defendant as a training agent in 1994, and eventually became a career agent under Mack Brown, the managing agent in Webster County until April 2008.[10]  Upon Brown's departure, the Board voted and approved Defendant's decision to promote Plaintiff as the acting agency manager.[11]  Thus, from April 1, 2008, until her termination eight months later, Plaintiff was the acting agency manager.  After Brown left, Defendant did not hire a second agent, and therefore Plaintiff remained as Defendant's sole insurance agent in Webster County.[12]  During the almost 15 years Plaintiff worked for Defendant, she was never reprimanded or disciplined in any way until the incidents giving rise to this lawsuit took place.

<u>Plaintiff's Relationship with Paul Stapleton</u>

Plaintiff was born and raised in Webster County and had been friends with Paul Stapleton, an influential policy-holder with Defendant, since she was a teenager.[13] In 1996, Plaintiff and Stapleton, who were both divorced at that time, began an ongoing,

---

[9] Document signed by Plaintiff and her district sales manager, David Farnsworth dated March 24, 2008, Pl. Depo., Ex. 6 [Doc. 18-10]; Pl. Depo., pp. 38-39 [Doc. 18-9].
[10] *Id*. at pp. 18-21.
[11] *Id*. at pp. 36 - 37.
[12] *Id*. at p. 20.
[13] *Id*. at p. 60.

consensual sexual relationship that ended in 1999, prior to both Plaintiff's and Stapleton's second marriages.[14] Prior to the events leading to her termination in 2008, Plaintiff and Stapleton had maintained a friendship and business relationship.[15]

Stapleton held both business and personal insurance accounts with Defendant at all times during Plaintiff's employment.  Plaintiff continuously served as the insurance agent on Stapleton's business insurance accounts until her termination in December 2008.[16]  However, Plaintiff only served as the insurance agent on Stapleton's personal insurance accounts until the end of January 2004, when Stapleton's wife, Allyson, requested that their personal accounts be transferred to Brown, the acting agency manager.[17] The transfer occurred within days after Stapleton first inappropriately touched Plaintiff.

On January 20, 2004, Plaintiff met Stapleton at his newly-built house to inspect it for a new insurance policy.[18] While at the house Stapleton made inappropriate comments to Plaintiff about continuing their past sexual relationship.[19]  He then put his

---

[14] *Id*. at p. 62.
[15] *Id*. at pp. 60-64.
[16] *Id*. at pp. 66-67.
[17] *Id*. at pp. 69-71; Brown Depo., pp. 4-7; 14-15 [Doc. 18-4].
[18] Pl. Depo., pp. 71-72 [Doc. 18-9].
[19] *Id*.

hands on her breasts and said, "they don't look as big as they used to."[20]   Plaintiff immediately rebuffed his advances.[21]

After returning to the office, Plaintiff informed Brown, her managing agent, about the incident, telling him that Stapleton had been "overly friendly," "aggressive," and "put his hands on [her]."[22]   Brown did not inform his superiors.   After Allyson requested that their personal insurance policies be transferred from Plaintiff, Plaintiff informed Brown in more detail about the incident with Stapleton.[23]   She also informed her district manager at the time, David Farnsworth, of the incident.[24]   Neither the managing agent nor the district manager reported the incident to their superiors.

Despite Plaintiff's objections to Stapleton's actions during the home inspection, he continued to display sexually inappropriate conduct and make inappropriate comments to Plaintiff until the events giving rise to her termination took place in 2008. Although Plaintiff attempted not to service Stapleton's accounts in an effort to avoid contact with him, he continued to ask specifically for her.[25]   Indeed, sometime after the home inspection in 2004, Stapleton and Plaintiff met at one of his farms to complete

---

[20] *Id.* at pp. 71-72.
[21] *Id.* at p. 72.
[22] *Id.* at pp. 70; 80.
[23] *Id.* at p. 81.
[24] *Id.* at p. 83.
[25] *Id.* at pp. 87-88.

insurance paperwork, and he grabbed Plaintiff's buttocks.[26]  Stapleton regularly came by to see Plaintiff at the office to check on his business accounts and "chat."[27]  Stapleton was "flirty" and continued to make sexual comments to her, alluding to her breasts and commenting on what she was wearing or how low her shirt was.[28]  He would tell Plaintiff that his wife was jealous of her.[29]  During a period of time Stapleton called Plaintiff's cell phone every day.[30]  Plaintiff did not pursue an official complaint against Stapleton because she felt that if she reported his conduct, "he would come after [her]. [She] knew the power he had with [Defendant]."[31]  Indeed, Plaintiff was "trained to look after [her] farm members[,] . . . try not to question them[,] . . . [and] try to keep [her] farm members happy."[32]

In 2008 when Plaintiff became the acting agency manager and only agent in Webster County, she again became the agent on the Stapletons' personal insurance accounts.[33]  Allyson, unhappy with this arrangement, inquired with an agent in a neighboring county about moving their accounts from Webster County.[34] She became

---

[26] *Id.*, pp. 77-88.
[27] *Id.* at p. 60.
[28] *Id.* at p. 79.
[29] *Id.* at p. 63.
[30] *Id.* at p. 89.
[31] *Id.* at p. 84.
[32] *Id.* at p. 87.
[33] *Id.* at p. 66.
[34] *Id.* at pp. 93-94.

upset when she learned that Plaintiff had talked to the agent from the neighboring county.[35]

On September 8, 2008, Allyson telephoned Plaintiff at work, initiating a heated and contentious discussion.[36]   Two days later, on September 10, 2008, Allyson complained to Defendant's district manager and Plaintiff's direct supervisor, Mark Herndon, about Plaintiff's unprofessional conduct during their telephone conversation.[37]   Allyson stated that she and her husband "were not objecting the idea of moving all of [their] business out of the Webster County Farm Bureau office" and that she expected a verbal apology from Plaintiff.[38]   Stapleton also threatened that if he did not receive an in-person apology from Plaintiff, he was seriously considering moving his accounts either out of the county or away from Defendant all together.[39]

Plaintiff's Relationship with the Webster County Farm Bureau Board

Contemporaneous to Plaintiff's issues with the Stapletons, Plaintiff also began having problems with the Webster County Farm Bureau Board.  On September 18, 2008, the Board held its first meeting after Plaintiff became acting agency manager.[40]   Because

---

[35] *Id.* at pp. 94-95.
[36] *Id.* at pp. 92-93.
[37] Letter from Allyson Stapleton to Mark Herndon dated Sept. 10, 2008, Pl. Depo., Ex. 11 [Doc. 18-10].
[38] *Id.*
[39] Pl. Depo., p. 27 [Doc. 18-9].
[40] *Id.* at pp. 134-135.

9

the Board pays the secretary's salary, Plaintiff indicated that the secretary deserved a raise.[41]  In response, Bill Minick, a long-time Board member, asked Plaintiff if her salary had increased since she became the sole agent in the office and how much money she made.[42]  After Plaintiff refused to disclose her salary, he then remarked, "now that you are making more money, looks like you can afford to supplement [the secretary's] salary."[43]  Plaintiff responded that paying the secretary from her salary was not Farm Bureau policy.[44]  In the 15 years Plaintiff had been employed by Defendant, the Board never asked her male predecessors the amount of their salaries or that they supplement the salary of the support staff.[45]

Immediately after the Board meeting, Plaintiff sent an e-mail to Board president Gerald Smith stating that she was offended by Board member Minick's remarks concerning her salary, stating that his comments "seemed like sexual discrimination."[46] Smith responded that he did not believe Minick's comments "were intended to

---

[41] *Id.* at pp. 114-115.
[42] *Id.* at p. 115.
[43] *Id.* at p. 115.
[44] *Id.*
[45] *Id.* at pp. 134-135; E-mail from Sandra Hubbard to Gerald Smith dated September 18, 2008, Pl. Depo., Ex. 13 [Doc. 18-10].
[46] E-mail from Sandra Hubbard to Gerald Smith dated September 18, 2008, Pl. Depo., Ex. 13 [Doc. 18-10].

offend."[47]   He copied Ken Murphree, employed by Defendant as a liason between the Board and Defendant, on his response e-mail to Plaintiff.[48]

Approximately a week to ten days after the Board meeting on September 18, 2008, Ken Murphree contacted Herndon, the district manager and Plaintiff's direct supervisor, to discuss the concerns raised at the Board meeting and requested Herndon set up a meeting with Board president Smith.[49]   Thereafter, the first of three meetings between Plaintiff's direct supervisor, Board president Smith, and Board member Minick took place to discuss Plaintiff's employment. At the first meeting in late September, the three men discussed the incident at the Board meeting and Allyson's complaint letter.[50]

In early October, a second meeting took place between district manager Herndon, liason Murphree, and only three Board members, including Board president Smith and Board member Minick.[51]   It was decided at this meeting that Herndon would discuss the issues of both the Board meeting and Allyson's complaint letter with Plaintiff.[52]

---

[47] *Id*.
[48] *Id*.
[49] Herndon Depo., p. 24 [Doc. 18-5]; Murphree Depo., p. 15 [Doc. 19-18] .
[50] Herndon Depo., pp. 18-19 [Doc. 18-5].
[51] Herndon Depo., pp. 41-4 [Doc. 18-5]; Murphree Depo., pp. 21-24 [Doc. 19-18]; Smith Depo., pp. 31-34 [Doc. 19-19]; Minick Depo., pp. 31-32 [Doc. 18-8].
[52] *Id*.

Plaintiff's Complaints and Ultimate Termination

On October 15, 2008, shortly after the second meeting with the select Board members, district manager Herndon met with Plaintiff for the first time to discuss Allyson's letter of complaint and the comments made during the September Board meeting.  Plaintiff told Herndon the letter was the result of a personal situation and Allyson's jealousy.[53]  Herndon told Plaintiff he felt she needed to apologize to the Stapletons, but he did not make an apology a condition of her continued employment.[54] In fact, he even stated that he could not require Plaintiff to apologize.[55] He told Plaintiff she would receive a warning for her conduct.[56]  Plaintiff then shared her specific concerns about Board member Minick's comments during the September 18 Board meeting.[57]

Approximately two weeks later, on October 29, 2008, Herndon met with Plaintiff for the second time and presented the warning.  The warning stated:

> Please allow this memo to recap our meeting October 15th 2008 to discuss your unprofessional conduct toward Webster County Farm Bureau Members.  Based on our conversation and information I have received I felt that an apology was in order and encouraged you to do so.  You were adamant in your refusal to consider my suggestion.

---

[53] Herndon Depo., p. 32 [Doc. 18-5].
[54] *Id.* at p. 46.
[55] Pl Depo., p. 144 [Doc. 18-9].
[56] Herndon Depo., p. 46 [Doc. 18-5].
[57] Pl. Depo. at pp. 144-45 [Doc. 18-9].

> Please be aware that future displays of unprofessional conduct on your part may jeopardize your position with the Farm Bureau Companies.[58]

Plaintiff signed the warning, acknowledging her understanding of the terms. At this meeting, district manager Herndon encouraged Plaintiff to salvage the Stapleton account and put her personal issues to the side.[59] Again, Herndon told Plaintiff that he could not force her to apologize.[60] Plaintiff believed the matter was resolved.[61]

However, in early November 2008, the third and final meeting took place between liason Murphree, district manager Herndon, and a select few Board members, including Board president Smith and Board member Minick.[62] During this meeting, the Board members raised concerns about Plaintiff, including rumors of problems in the County office and the likelihood of losing the Stapleton account.[63]

Thereafter, on November 12, 2008, district manager Herndon met with Plaintiff for the third time about the "Stapleton situation."[64] Plaintiff told Herndon that everything was fine, and when he asked her again to apologize, Plaintiff again

---

[58] Warning memorandum signed by Sandra Hubbard and Mark Herndon, Pl. Depo., Ex. 14 [Doc. 18-10].
[59] Herndon Depo., p. 36 [Doc. 18-5].
[60] Pl. Depo., pp. 146-47 [Doc. 18-9].
[61] *Id.* at p. 149.
[62] Herndon Depo. at pp. 41-42 [Doc. 18-5].
[63] *Id.*
[64] Pl. Depo. at pp. 150-51 [Doc. 18-9].

refused.[65]   Plaintiff then told Herndon of Stapleton's sexually offensive behavior.[66] Herndon told Plaintiff to not contact Stapleton, that he needed to report this to human resources, and that an investigation would ensue.[67]   Herndon also informed Plaintiff at this meeting that she had a problem with the Board.[68]

Two days later, after discussing Plaintiff's sexual harassment complaint with his supervisor, district manager Herndon called Plaintiff and told her that Kathy Hawthorne, Defendant's Director of Human Resources, would set up a meeting to discuss and investigate her sexual harassment claims.[69]   Hawthorne, however, never met with Plaintiff, and no investigation of Plaintiff's complaints ever took place.[70]

Instead, three weeks later on December 4, 2008, Herndon met with Plaintiff for the fourth time regarding her unprofessional conduct toward the Stapletons, conduct for which she had received a warning over a month earlier.  For the first time, Herndon made an apology to the Stapletons a condition of her continued employment, informing her that if she did not apologize to the Stapletons in person, she would be terminated.[71] Plaintiff refused to apologize, and thus, Herndon terminated her, effective December

---

[65] *Id.*
[66] *Id.*
[67] *Id.*
[68] *Id.* at p. 154.
[69] *Id.* at p. 162.
[70] *Id.* at p. 164.
[71] *Id.* at pp. 168-69.

14, 2008.  Plaintiff's termination occurred less than three months after she first wrote the Board complaining of sex discrimination, and less than a month after the November 12, 2008 meeting when Plaintiff complained of Stapleton's sexually inappropriate behavior.

Procedural History

On January 22, 2009, Plaintiff completed an online intake questionnaire with the Equal Employment Opportunity Commission ("EEOC") alleging unlawful termination by Defendant.  On the questionnaire Plaintiff identified the parties and described in detail the alleged unlawful conduct by Defendant.  Plaintiff checked the box at the end of the questionnaire indicating that she wished to file a charge.  In March of 2009, the EEOC began an investigation and assigned Plaintiff's case a charge number.  On April 23, 2009, an EEOC investigator sent an official Notice of Charge of Discrimination to Defendant's Webster County Farm Bureau office.  However, the EEOC did not mail Plaintiff the official charge form until June 18, 2009, after the statutory 180-day period had expired.  Plaintiff signed and returned the official charge form on June 24, 2009, and a subsequent Notice of Charge of Discrimination was mailed to Defendant's Webster County Farm Bureau office on July 13, 2009.

After receiving her right to sue letter from the EEOC, Plaintiff filed this lawsuit seeking damages against Defendant for unlawfully terminating her in retaliation for her

15

protected conduct of opposing sex discrimination and sexual harassment.  Thereafter, Defendant filed the current Motion for Summary Judgment.

## LEGAL STANDARD

Under Rule 56 of the Federal Rules of Civil Procedure, summary judgment must be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."[72]   A genuine issue of material fact only exists when "there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party."[73]  Thus, summary judgment must be granted if there is insufficient evidence for a reasonable jury to return a verdict for the nonmoving party or, in other words, if reasonable minds could not differ as to the verdict.[74]  When ruling on a motion for summary judgment, the court must view the facts in the light most favorable to the party opposing the motion.[75]

The moving party "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of

---

[72] Fed. R. Civ. P. 56(a); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986 ).
[73] *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986).
[74] *See id.* at 249-52.
[75] *Welch v. Celotex Corp.,* 951 F.2d 1235, 1237 (11th Cir. 1992).

material fact" and that entitle it to a judgment as a matter of law.[76]  If the moving party discharges this burden, the burden then shifts to the nonmoving party to go beyond the pleadings and present specific evidence showing that there is a genuine issue of material fact.[77]  This evidence must consist of more than mere conclusory allegations or legal conclusions.[78]

## DISCUSSION

Plaintiff claims Defendant terminated her in retaliation for reporting sex discrimination by the Board and sexual harassment by Stapleton, in violation of Title VII.  Defendant first contends Plaintiff's claims fail because they are time-barred by Title VII's limitation period.   Alternatively, Defendant contends the claims fail because Plaintiff can neither prove her prima facie cases of retaliation nor prove that Defendant's legitimate reason for termination is pretext for retaliation.

## Administrative Exhaustion

First, Defendant argues that Plaintiff's retaliation claims are time-barred by Title VII's limitation period.  It is well-settled that before filing suit under Title VII a plaintiff must exhaust certain administrative procedures.[79]  In Georgia, exhaustion requires that

---

[76] *Celotex Corp.,* 477 U.S. at 323 (internal quotation marks omitted).
[77] *See* Fed. R. Civ. P. 56(e); *see also Celotex Corp.,* 477 U.S. at 324-26.
[78] *See Avirgan v. Hull,* 932 F.2d 1572, 1577 (11th Cir. 1991).
[79] *Wilkerson v. Grinnell Corp.,* 270 F.3d 1314, 1317 (11th Cir. 2001) (citation omitted).

a plaintiff file a charge of discrimination with the EEOC within 180 days after the alleged unlawful employment practice occurred.[80]  Failure to file a timely charge entitles the defendant to summary judgment.[81]

Here, it is undisputed that Plaintiff did not file her official charge with the EEOC until June 24, 2009, 192 days after her termination on December 14, 2008.  However, five months earlier on January 22, 2009, well within the 180 day statutory period, Plaintiff completed an online intake questionnaire form with the EEOC and checked the appropriate box indicating that she wished to file a charge against Defendant.  Thus, the issue is whether the intake questionnaire that Plaintiff submitted online is sufficient to constitute a charge made to the EEOC.

Under the law of the Eleventh Circuit, the Court may find that a verified intake questionnaire which includes the "basic information suggested by 29 C.F.R. § 1601.12(a) may constitute a charge for purposes of the Title VII statute of limitations when the circumstances of the case would convince a reasonable person that the charging party manifested her intent to activate the administrative process by filing the intake

---

[80] 42 U.S.C.A. § 2000e-5(e)(1); *Watson v. Blue Circle, Inc.*, 324 F.3d 1252, 1258 (11th Cir. 2003).
[81] *See, e.g., Armstrong v. Martin Marietta Corp.*, 138 F.3d 1374, 1394 (11th Cir. 1998); *accord Wilson v. Bailey*, 934 F.3d 301, 304 n. 1 (11th Cir. 1991) ("Failure to file a timely complaint with the EEOC mandates the dismissal of the Title VII suit.").

18

questionnaire with the EEOC."[82]   This "manifest-intent approach requires a charging

party to indicate clearly that she wishes to activate these functions" and "ensure[ ] that,

once a charging party's intent is made clear, the EEOC's inaction will not vitiate her

claim" but also "not treat intake questionnaires willy-nilly as charges. . . ."[83]

"To determine whether the intake questionnaire . . . can function as a charge,"

the Eleventh Circuit requires analysis of the "following question: Would the

circumstances of this case convince a reasonable person that [plaintiff] manifested her

intent to activate the machinery of Title VII by lodging her intake questionnaire with the

EEOC?"[84]  "Some facts relevant to [that] inquiry include what [the plaintiff] and EEOC

personnel said to each other, what the questionnaire form itself indicated, and how the

EEOC responded to the completed questionnaire."[85] Also the Supreme Court has

explained that whether the filing demonstrates "an individual's intent to have the

agency initiate its investigatory and conciliatory processes . . . must be examined from

the standpoint of an objective observer to determine whether, by a reasonable

---

[82] *Wilkerson*, 270 F.3d at 1321.
[83] *Id*. at 1320-21.
[84] *Id*. at 1321.
[85] *Id*.

construction of its terms, the filer requests the agency to activate its machinery and remedial processes. . . ."[86]

Applying this "manifest-intent" test here, the Court finds Plaintiff's intake questionnaire is sufficient to constitute a charge.  First, the intake questionnaire meets the basic requirements for an EEOC charge – that "it be in writing under oath or affirmation and [ ] contain such information and be in such form as the Commission requires."[87]  Although Plaintiff did not verify her questionnaire, she did subsequently verify the official charge she filed on June 24, 2009.  The EEOC regulations specifically provide for curing the omission of "failure to verify the charge" and that such an amendment relates back.[88]   Thus, Plaintiff cured this defect. The EEOC regulations require that

> [e]ach charge should contain . . . [t]he full name, address and telephone number of the person making the charge . . . [t]he full name and address of the person against whom the charge is made, . . . [a] clear and concise statement of the facts, including pertinent dates, constituting the alleged unlawful employment practices, . . . [i]f known, the approximate number of employees of the respondent employer . . . and . . . [a] statement disclosing whether proceedings involving the alleged unlawful employment practice have been commenced before a State or local agency

---

[86] *Fed. Exp. Corp. v. Holowecki*, 552 U.S. 389, 402 (2008) (citing *Wilkerson*, 270 F.3d at 1319) (other citations omitted) (explaining that if *Wilkerson*'s "manifest intent" requires an objective determination, then "that would be in accord with [the Court's] conclusion").

[87] 42 U.S.C. § 2000e-5(b); *see also* 29 C.F.R. § 1601.9 ("A charge shall be in writing and signed and shall be verified.").

[88] 29 C.F.R. § 1601.12(b).

charged with the enforcement of fair employment practice laws and, if so, the date of such commencement and the name of the agency.[89]

Plaintiff provided all of this information in the questionnaire.

Second, from the facts presented, a reasonable person could determine that Plaintiff intended to "activate the machinery of Title VII."[90]   The questionnaire plainly stated, "[i]f you want to file a charge, you should check Box 1, below."[91]   Plaintiff checked Box 1 on the questionnaire, which specifically stated:

> I want to file a charge of discrimination, and I authorize the EEOC to look into the discrimination I described above.  I understand that the EEOC must give the employer . . . that I accuse of discrimination information about the <u>charge</u>, including my name.  I also understand that the EEOC can only accept charges of job discrimination based on race, color, religion, sex, national origin, disability, age, or retaliation for opposing discrimination.[92]

The questionnaire does not make clear that Plaintiff would need to file an additional formal charge; indeed, the questionnaire refers to the information provided specifically as a charge.  A reasonable person clearly could find that in checking Box 1, Plaintiff was, in fact, filing a formal charge of discrimination.   Moreover, the EEOC began an investigation of Plaintiff's claims in March 2009 and assigned the case a charge

---

[89] 29 C.F.R. § 1601.12(a).
[90] *Wilkerson*, 270 F.3d at 1321.
[91] Pl. Online EEOC Intake Questionnaire [Doc. 19-9].
[92] *Id.*  (emphasis added).

21

number.[93]   Defendant received notice of Plaintiff's allegations in April 2009, and Plaintiff left telephone messages and sent e-mails to the EEOC to inquire and follow up on her complaints.   This evidence establishes that Plaintiff intended to initiate the investigatory process of her claims.   Thus, Plaintiff's claims are not time-barred by Title VII's statutory time period, and the Court must address the merits of Plaintiff's retaliation claims.

## I.   Merits of Plaintiff's Retaliation Claims

Plaintiff claims she was unlawfully terminated in retaliation for her statutorily protected conduct of (1) opposing sex discrimination by the Board and (2) opposing sexual harassment by Paul Stapleton, both in violation of Title VII.

Title VII makes it unlawful for an employer to retaliate against an employee for her participation in certain statutorily protected activities:

> It shall be an unlawful employment practice for an employer to discriminate against any of his employees . . . because he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter.[94]

---

[93] EEOC records [Doc 19-10 & 19-11].
[94] 42 U.S.C. § 2000e-3(a).

The former clause is known as the "opposition clause"; the latter is known as "the participation clause."[95]

Plaintiff brings both of her retaliation claims under the "opposition clause" of Title VII.  Under the opposition clause, an employee is protected from discrimination if she opposes an employer's unlawful practice.[96]  Plaintiff alleges that she was unlawfully terminated in retaliation for opposing unlawful employment practices of sex discrimination and sexual harassment.

Where, as here, a plaintiff relies on circumstantial evidence to prove retaliation, the Court applies the burden shifting framework developed in *McDonnell Douglas Corp. v. Green*.[97]  Under this analysis, a plaintiff must establish a prima facie case of retaliation by showing that: "(1) she engaged in statutorily protected activity, (2) an adverse employment action occurred, and (3) the adverse action was causally connected to the plaintiff's protected activities."[98]  If the plaintiff establishes a prima facie case, the burden of production shifts to the employer to articulate some legitimate, nondiscriminatory reason for its action.[99]  The burden then shifts back to the plaintiff

---

[95] *See, e.g., Hudson v. Norfolk S. R.R. Co.*, 209 F. Supp. 2d 1301, 1308 (N.D. Ga. 2001).
[96] 42 U.S.C. § 2000e-(3)(a).
[97] 411 U.S. 792 (1973).
[98] *Gregory v. Ga. Dept. of Human Res.*, 355 F.3d 1277, 1279 (11th Cir. 2004) (internal quotation marks omitted).
[99] *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 256 (1981).

23

who must show that the employer's proffered reasons for its actions were not the real reasons that motivated its conduct, but that the employer's proffered reasons were merely pretext for prohibited retaliatory conduct.[100]

## A.  Opposition to Sex Discrimination

### 1.  Prima Facie Case

Plaintiff's burden of establishing a prima facie case is not heavy,[101] and the Court finds genuine issues of material fact exist as to whether Plaintiff establishes a prima facie case of retaliation for her opposition to sex discrimination.

#### a.  <u>Statutorily Protected Activity</u>

First, Plaintiff must establish that she engaged in statutorily protected activity. To establish that she engaged in a statutorily protected activity, Plaintiff must show that she "had a good faith, reasonable belief in unlawful employment practices."[102]  It is "not enough for a plaintiff to allege that h[er] belief in this regard was honest and bona fide; the allegations and record must also indicate that the belief, though perhaps mistaken,

---

[100] *McCann v. Tillman*, 526 F.3d 1370, 1375 (11th Cir. 2008) (citation omitted) ("[I]f the [defendant] articulate[s] legitimate reasons for their actions, [the plaintiff] must then show that the employer's proffered reasons for taking the adverse action were actually a pretext for prohibited retaliatory conduct.").

[101] *See, e.g., Crapp v. City of Miami Beach*, 242 F.3d 1017, 1020 (11th Cir. 2001) ("[T]he prima facie requirement is not an onerous one. . . .").

[102] *Weeks v. Harden Mfg. Corp.*, 291 F.3d 1307, 1311-12 (11th Cir. 2002) (quotation omitted).

24

was objectively reasonable."[103]   In other words, an employee's statements constitute "protected activity" only if they reflect an objectively reasonable, subjective belief that the employer engaged in an unlawful employment practice.

To show that she engaged in statutorily protected conduct, Plaintiff does not have to prove actual sex discrimination.[104]   Rather, she must show that she reasonably held a good faith belief that the discrimination existed.[105]   "The objective reasonableness of an employee's belief that her employer has engaged in an unlawful employment practice must be measured against existing substantive law."[106]   In order to establish sex discrimination, a plaintiff must show that (1) she belongs to a protected class; (2) that she was subjected to an adverse employment action; (3) her employer treated similarly situated employees outside her classification more favorably; and (4) she was qualified to do the job.[107]

Plaintiff contends she engaged in statutorily protected expression when she sent the e-mail to Board president Smith complaining of sex discrimination at the meeting on September 18, 2008.[108]   Defendant does not dispute that it knew of both the e-mail

---

[103] *Id.* at 312 (quotation omitted).
[104] *Tipton v. Canadian Imperial Bank of Commerce*, 872 F.2d 1491, 1494 (11th Cir. 1989).
[105] *Id.*
[106] *Clover v. Total Sys. Servs., Inc.*, 176 F.3d 1346, 1351 (11th Cir. 1999).
[107] *Wilson v. B/E Aerospace, Inc.*, 376 F.3d 1079, 1091 (11th Cir. 2004).
[108] Pl. Depo., p. 115 [Doc. 18-9].

and Plaintiff's complaint of sex discrimination. Defendant does argue, however, that Plaintiff did not engage in statutorily protected activity because no reasonable person could find Plaintiff held an objectively reasonable, good faith belief she was a victim of sex discrimination.

Despite Defendant's arguments otherwise, a fact-finder could certainly determine that Plaintiff subjectively believed the Board was discriminating against her because she was female.  She plainly wrote in her e-mail: "I would like to be on record stating that I was offended by Bill Minick's remarks concerning my salary and my responsibilities. . . [,] and this seems like <u>sexual discrimination</u>."[109] Thus, the real issue is whether her subjective belief is objectively reasonable.

After reading the facts in the light most favorable to Plaintiff, the Court finds a reasonable jury could determine Plaintiff's belief was objectively reasonable.  Plaintiff was the first female acting agency manager in Webster County in at least 15 years. Board member Minick's comments occurred at her first Board meeting as acting manager.  Plaintiff had been employed by Defendant and working with the Board for almost 15 years and had never witnessed any Board member question her male predecessors about their salaries or ask them to supplement the support staff's salary.

---

[109] E-mail from Sandra Hubbard to Gerald Smith dated Sept. 18, 2008, Pl. Depo., Ex. 13 [Doc. 18-10] (emphasis added).

Defendant argues Plaintiff could not objectively believe she was being discriminated against because she knew the Board was not her employer and therefore had no control over her salary.  Again, the Court disagrees. Plaintiff is not required to prove her employer engaged in actual sex discrimination.  Plaintiff must prove that she reasonably believed she was opposing unlawful sex discrimination for which her employer unlawfully terminated her.  Thus, the fact she knew the Board was not her employer does not nullify her claim.    Indeed, the evidence is sufficient for a fact-finder to determine that Plaintiff's belief that the Board had authority over her employment was reasonable.  The Board voted and approved Plaintiff as the acting agency manager. Plaintiff's supervisors met with select Board members three times to discuss Plaintiff's employment.  Defendant's business model is premised on its agents working closely with county farm bureau boards to solicit and maintain its policy-holders.  Here, one of Plaintiff's duties of employment was to maintain a positive relationship with the Board and report to the Board.  From this evidence a reasonable jury could find Plaintiff's belief reasonable.  Thus, genuine issues of material fact exist as to whether Plaintiff engaged in statutorily protected conduct by opposing unlawful sex discrimination by the Board.

b. **Causal Connection**

Because Defendant does not dispute Plaintiff was subjected to an adverse employment action (her termination), Plaintiff must next establish a causal connection between her complaint of sex discrimination and her termination. Plaintiff's burden is a light one: "To meet the causal link requirement, the plaintiff 'merely has to prove that the protected activity and the negative employment action are not completely unrelated.'"[110] A sufficient causal relationship may be inferred if an adverse action is taken in close temporal proximity to the time "the decision-maker became aware of the protected activity."[111] The required temporal proximity is not a clearly-bounded concept, but it likely requires that the adverse employment action take place less than three months after the adverse actor's discovery of the protected activity.[112]

This Court cannot find as a matter of law that Plaintiff's termination and her complaints of sex discrimination are "not completely unrelated."[113] Plaintiff first complained of sex discrimination in her e-mail to Board member Smith on September 18, 2008; she was terminated less than three months later on December 4, 2008. Indeed,

---

[110] *Holifield v. Reno*, 115 F.3d 1555, 1566 (11th Cir. 1997) (quoting *E.E.O.C. v. Reichhold Chems., Inc.*, 988 F.2d 1564, 1571-72 (11th Cir. 1993)).
[111] *Farley v. Nationwide Mut. Ins. Co.*, 197 F.3d 1322, 1337 (11th Cir. 1999).
[112] *See Higdon v. Jackson*, 393 F.3d 1211, 1220-21 (11th Cir. 2004) (noting that a one-month gap would suggest a causal relationship, but refusing to recognize a three-month proximity between the protected activity and the adverse employment action as sufficient proof of causation).
[113] *Farley*, 197 F.3d at 1337.

28

Defendant terminated Plaintiff less than two months after she first directly reported her concerns about discrimination from the Board to her supervisor on October 15, 2008. Moreover, the evidence shows that after Plaintiff sent the e-mail, Board president Smith – to whom Plaintiff first complained of sex discrimination – and Board member Minick – who made the alleged discriminatory comments – began having meetings with Plaintiff's direct supervisor; after three of these meetings, Plaintiff was terminated. From these facts, a reasonable jury could determine a causal connection exists between Plaintiff's termination and her complaints of sex discrimination.

## 2. Pretext

Having found genuine issues of material fact with respect to Plaintiff's prima facie case of retaliation for opposing sex discrimination, the Court must next determine whether Defendant's stated legitimate, non-retaliatory reason for termination is merely pretext for retaliation. Defendant's stated reason for terminating Plaintiff – her failure to apologize to the Stapletons for her unprofessional conduct – is one "that might motivate a reasonable employer,"[114] and thus, Defendant has satisfied its "exceedingly light" burden of producing a legitimate, non-retaliatory reason for termination. [115]

---

[114] *Chapman v. AI Transp.*, 229 F.3d 1012, 1030 (11th Cir. 2000) (*en banc*).

[115] *See Vessels v. Atlanta Ind. School Syst.*, 408 F.3d 763, 769-770 (11th Cir. 2005) (employer's burden is exceedingly light and is satisfied as long as the employer articulates a clear and reasonable non-discriminatory basis for its actions).

Because Defendant has met its burden, Plaintiff must present sufficient evidence to create a genuine issue of material fact that Defendant's proffered legitimate reason for termination are merely pretext for race discrimination.  To establish pretext, Plaintiff "must demonstrate such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered reasons for its action that a reasonable fact-finder could find them unworthy of credence."[116]

The Court finds genuine issues of material fact exist as to whether Defendant's non-retaliatory reason for Plaintiff's termination is "unworthy of credence."  The close temporal proximity between Plaintiff's complaints of alleged sex discrimination and her termination – less than three months after she e-mailed Board president Smith and less than two months after she reported her concerns of sex discrimination directly to her supervisor – evidences pretext.[117]  More importantly, however, the evidence shows that Plaintiff's failure to apologize may not be the real reason she was terminated. A reasonable juror could find that Defendant had already punished Plaintiff for the exact behavior Defendant states she was later terminated for.  On October 29, 2008, Plaintiff signed a warning that specifically stated: "Please be aware that any <u>future</u> displays of unprofessional conduct on your part may jeopardize your position with the Farm

---

[116] *McCann*, 526 F.3d at 1375.
[117] *Hurlbert v. St. Mary's Health Care System*, 439 F.3d 1286, 1298 (11th Cir. 2006).

Bureau Companies."[118]  There is no evidence that she exhibited any "future displays of unprofessional conduct"; indeed, it appears she performed her regular duties with no complaints.  However, her supervisor continued to meet with a select number of Board members, including Board member Minick and Board president Smith, to discuss Plaintiff. Moreover, although her supervisor had encouraged Plaintiff to apologize to the Stapletons, he did not condition her employment on an apology until the day she was terminated on December 4, 2008, over a month and a half after Plaintiff had signed the warning.  Thus, a reasonable jury could find Defendant's proffered reason for Plaintiff's termination unworthy of credence and therefore is pretext for unlawful retaliation due to Plaintiff's report of sex discrimination by the Board.

### B. Opposition to Sexual Harassment

#### 1. Prima Facie Case

##### a. Statutorily Protected Activity

Plaintiff also contends she engaged in protected activity when she reported Stapleton's sexually offensive behavior to her direct supervisor on November 12, 2008. As stated earlier, in order to show that she engaged in statutorily protected conduct,

---

[118] Warning memorandum signed by Sandra Hubbard and Mark Herndon, Pl. Depo., Ex. 14 [Doc. 18-10] (emphasis added).

Plaintiff does not have to prove that Stapleton actually harassed her.[119]  Rather, she must show that she reasonably held a good faith belief that the harassment occurred.[120]  "The objective reasonableness of an employee's belief that her employer has engaged in an unlawful employment practice must be measured against existing substantive law."[121]  To establish a sexual harassment claim under Title VII, an employee must show, among other things, that the harassment was sufficiently severe or pervasive to alter the terms and conditions of employment and create a discriminatorily abusive working environment.[122]

Viewing the evidence in the light most favorable to Plaintiff, and drawing all inferences in Plaintiff's favor, a reasonable jury could determine that Plaintiff held a good faith belief Stapleton was sexually harassing her and that such belief was objectively reasonable.  Stapleton clearly propositioned Plaintiff to re-kindle a sexual relationship, grabbed her breast and put his hand on her buttocks.  The fact these acts occurred in 2004, more than five years before she reported them, does not render her belief unreasonable as a matter of law.  Viewing the evidence in the light most favorable to Plaintiff, Stapleton continuously made inappropriate sexual overtures to Plaintiff up

---

[119] *Tipton*, 872 F.2d at 1494.

[120] *Id.*

[121] *Clover*, 176 F.3d at 1351.

[122] *Mendoza v. Borden, Inc.*, 195 F.3d 1238, 1245 (11th Cir. 1999) (*en banc*).

until the events in 2008 that led to her termination.  Although Plaintiff was no longer the agent on his personal accounts, Stapleton would call and specifically ask for her; he regularly came by the office to "chat"; he called Plaintiff's cell phone every day for a period of time; and he made sexually inappropriate comments about her breasts and how low her shirt was.  Importantly, Stapleton was an influential policy-holder, holding multiple large policies with Defendant, and Plaintiff was the agent on his accounts. Moreover, Plaintiff's employment was based on maintaining a positive relationship with the policy-holders. Based on this evidence, a reasonable jury could find Plaintiff had a reasonable, good faith belief that she was subjected to sexual harassment.

The Court is mindful that in establishing her prima facie case of retaliation, Plaintiff is not required to establish the harassment actually occurred; only that the conduct was sufficient, for purposes of rebutting summary judgment, to establish she reasonably believed it was happening.[123]  Statutorily protected expression under Title VII includes internal complaints to superiors concerning conduct that could reasonably be viewed as sexually offensive.[124]   Viewing the facts in the light most favorable to Plaintiff, the Court cannot find, as a matter of law, that Stapleton's conduct could not be

---

[123] *See Mulkey v. Bd. of Com'rs of Gordon Cnty.*, 488 F. App'x. 384, 390 (11th Cir. 2012).
[124] *See, e.g., Pipkins v. City of Temple Terrace, Fla.*, 267 F.3d 1197, 1201 (11th Cir. 2001) ("Statutorily protected expression includes internal complaints of sexual harassment to superiors.").

reasonably viewed as sexually offensive.  Thus, triable issues of fact exist as to whether Plaintiff engaged in statutorily protected activity.

### b.  <u>Causal Connection</u>

The fact that Plaintiff was terminated less than one month after making the sexual harassment complaint is enough to meet the causation element of her prima facie case.  "To meet the causal link requirement, the plaintiff 'merely has to prove that the protected activity and the negative employment action are not completely unrelated.'"[125] A sufficient causal relationship may be inferred if an adverse action is taken in close temporal proximity to the time "the decision-maker became aware of the protected activity."[126]  Plaintiff reported Stapleton's sexually offensive conduct to her direct supervisor on November 12, 2008.  Less than one month later, on December 4, 2008, she was terminated.   Thus, from temporal proximity alone, a causal connection exists between Plaintiff's report of the alleged unlawful conduct and her termination.

### 2.  **Pretext**

Genuine issues of material fact also exist as to whether Defendant's non-retaliatory reason for Plaintiff's termination – her failure to apologize to the Stapletons – is merely pretext for unlawful retaliation of her report of Stapleton's sexually offensive

---

[125] *Holifield*, 115 F.3d at 1566 (quoting *Reichhold Chems.*, 988 F.2d at 1571-72).
[126] *Farley v. Nationwide Mut. Ins. Co.*, 197 F.3d 1322, 1337 (11th Cir. 1999).

conduct.  As discussed in the previous section on pretext, the temporal proximity of Plaintiff's termination and her report of Stapleton's alleged unlawful conduct – less than one month – is even stronger evidence of pretext here.  In addition, although Plaintiff's supervisor stated that Defendant would initiate an investigation of the alleged harassment, no such investigation ever took place.  Moreover, as stated in the previous section, a reasonable jury could determine Defendant's stated reason for termination is unworthy of credence.  Viewing the evidence in Plaintiff's favor, Defendant punished her for unprofessional conduct toward the Stapletons on October 29, 2008; she did not exhibit any future unprofessional conduct; she reported Stapleton's sexual harassment; yet, less than one month later Defendant terminated her for the unprofessional conduct she had been punished for a month and half earlier. These facts, together with the additional reasons set forth in the previous section, create genuine issues of material fact as to whether Defendant's non-retaliatory reason for Plaintiff's termination is merely pretext for retaliation based on Plaintiff's report of sexual harassment.

**CONCLUSION**

Based on the foregoing, Defendant's Motion for Summary Judgment [Doc. 18] is hereby **DENIED**.

35

**SO ORDERED,** this 29th day of March, 2013.

S/  C. Ashley Royal

C. ASHLEY ROYAL

UNITED STATES DISTRICT JUDGE

SSH/lmh